FILED

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**   : 2014 OCT -3 P 4: 48

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **FCC ENVIRONMENTAL, LLC** ) | |
| ) | |
| **Plaintiff,** ) | Civil Action No. _1:14CV1316_ |
| ) | **JURY TRIAL DEMANDED** _LmB/TCB_ |
| **v.** ) | |
| ) | |
| **AIG SPECIALTY INSURANCE CO.** ) | |
| **Formerly known as** ) | |
| **CHARTIS SPECIALTY INSURANCE CO.** ) | |
| ) | |
| **SERVE:**   **General Counsel, Law Department**) | |
| **AIG Specially Insurance Co.** ) | |
| **Formerly known as** ) | |
| **Chartis Specialty Insurance Co.** ) | |
| **175 Walter Street** ) | |
| **New York, NY 10038** ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiff, FCC ENVIRONMENTAL, LCC ("**FCC Environmental**"), by counsel, hereby

files its Complaint against Defendant, AIG SPECIALITY INSURANCE CO. ("**ASIC**"),

formerly known as CHARTIS SPECIALTY INSURANCE CO. ("**Chartis**"), and in support

thereof states as follows:

### I.    THE PARTIES

1.    FCC Environmental is a Delaware corporation with its principal place of business

in Houston, Texas. It is primarily engaged in the business of collecting, transporting, processing

and re-refining used oil collected from generators of used oil, which FCC Environmental sells as

fuel.

2.     ASIC is an Illinois corporation with its principal place of business in Chicago, Illinois. ASIC operated under the name Chartis Specialty Insurance Company from November 2009 until October 2013, when the company adopted its current name. On information and belief, ASIC is a property-casualty and general insurance company operating on a non-admitted basis in all fifty states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332 (2012) as there is complete diversity between Plaintiff and Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and attorneys' fees.

4.     This Court has personal jurisdiction over the Defendant based upon the Defendant's contracting to insure any person, property, or risk located within the Commonwealth of Virginia, including the person, property or risk that is the subject of this insurance coverage dispute. This Court also has personal jurisdiction over the Defendant based upon the Defendant's transaction of property-casualty and general insurance business in the Commonwealth of Virginia.

5.     Venue is proper in this judicial district and division because the person, property and/or risk that is the subject of this insurance coverage dispute exist in the Eastern District of Virginia and the coverage-related events primarily occurred in the Eastern District of Virginia.

## III.    STATEMENT OF FACTS

### A. The Policy

6.     On or about May 1, 2011, Chartis issued FCC Environmental a Pollution Legal Liability Select Policy, Policy # PLS 12780665, with effective dates from May 1, 2011 to May 1, 2014 (the "**Policy**"). A true and accurate copy of the Policy, including all endorsements, is

2

attached hereto as **Exhibit 1**. This policy replaced an earlier Pollution Liability Policy dated
October 1, 2009 (the "**2009 Policy**").

      7.     Because FCC Environmental is in the business of collecting, transporting,
processing and re-refining used oil collected from third-party generators ("**Generators**"), which
it stores in large holding tanks, processes, and later sells as fuel, FCC Environmental desired to
purchase a policy from Chartis that provided the most comprehensive environmental insurance
coverage available in the marketplace. Chartis was aware of this desire and led FCC
Environmental to believe that the Policy would meet FCC Environmental's substantial
environmental insurance coverage needs.

      8.     ASIC knew or should have known, based on direct discussions relating to the
2009 Policy and again in 2011 relating to the Policy with FCC Environmental representatives, its
brokers, the documents provided as well as other general information regarding the business
practices of oil recyclers, that Generators from whom used oil was collected had on occasion
supplied used oil containing polychlorinated biphenyls ("**PCBs**"), a highly toxic compound that
had been prohibited from being manufactured in the United States by the Toxic Substance
Control Act ("**TSCA**") since 1979.

      9.     ASIC knew or should have known that given the nature of FCC Environmental's
operations, there was the opportunity for PCBs to be present in the used oil it collected from
individual Generators which would then be transferred to a storage tank and when mixed with
other quantities of used oil would cause the release and dispersal of PCBs, and the further
contamination of all product in the storage tank.

      10.    As this type of pollution condition was readily foreseeable, FCC Environmental
believed that the Policy it had purchased covered such a pollution event or condition.

11.     The premium for the Policy was six hundred sixty-seven thousand and forty dollars ($667,040.00), which FCC Environmental paid and thereby acquired an aggregate policy limit of forty million dollars ($40,000,000.00) in coverage. (**Ex. 1** at Declarations, Item 4, 6.)

12.     The Policy provided FCC Environmental with the following types of environmental insurance coverage from Chartis/ASIC:  (i) Coverage A – On-Site Clean-up of Pre-Existing Conditions; (ii) Coverage B – On-Site Clean-Up of New Conditions; (iii) Coverage C – Third Party Claims for Off-Site Clean Up Resulting from Pre-Existing Conditions; (iv) Coverage D – Third Party Claims for Off-Site Clean-Up Resulting from New Conditions; (v) Coverage E – Third-Party Claims for Bodily Injury and Property Damage; (vi) Coverage F – Emergency Response Costs; (vii) Coverage G – Third Party Claims for Non-Owned Locations; (viii) Coverage H – Third- Party Claims for Covered Operations; (ix) Coverage I – Third Party Claims Resulting from Transportation of Cargo; (x) Coverage J – Business Interruption Expenses. (**Ex. 1** § I.)

13.     **Coverage B** includes coverage for "1 . . . **Clean-Up Costs** resulting from a **Pollution Condition** on or under the **Insured Property** that first commenced on or after the **Continuity Date** . . ." (**Ex. 1** § I. (emphasis in original).)

14.     The Policy defines "Clean-Up Costs" to include:

> reasonable and necessary expenses, including legal expenses incurred with the Company's written consent which consent shall not be unreasonably withheld or delayed for the investigation, removal, treatment including in-situ treatment, remediation including associated monitoring, or disposal of soil, surfacewater, groundwater, **Microbial Matter**, Legionella pneumophila, or other contamination. 1. To the extent required by **Environmental Laws** or required to satisfy a **Voluntary Cleanup Program**. . .

(**Ex. 1** § VIII. (emphasis in original).) "Environmental Laws" are defined as "any federal, state, provincial or local laws . . . that are applicable to the **Pollution Condition**." (*Id.*) "Voluntary

Cleanup Program" is defined by the Policy as "a program of the United States or a state of the United States enacted pursuant to **Environmental Laws** which provide for a mechanism for the written approval of, or authorization to conduct, voluntary remedial action for the cleanup, removal or remediation of a **Pollution Condition** that exceeds actionable levels established pursuant to **Environmental Laws**." (*Id.*)

15. The Policy defines "Pollution Condition," in relevant part, as follows:

1. The discharge, *dispersal, release* or escape; or
2. The *illicit abandonment* on or after the **Inception Date** by a third party without the **Insured's** consent, of any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, hazardous substances, low-level radioactive material, electromagnetic fields, medical waste including infectious and pathological waste and waste materials *into or upon* land, or *any structure on land*, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment in the amounts or concentrations discovered. . . .

(**Ex. 1** § VIII (emphasis added and in original).)

16. The "Continuity Date" and "Inception Date" are defined under the Policy as May 1, 2011. (**Ex. 1** § VIII, Declaration Items 2, 8.) The Policy's "Insured" includes FCC Environmental and "any past or present director, officer, partner, member, manager or employee thereof, including a temporary or leased employee, while acting within the scope of his duties as such." (**Ex. 1.** § VIII.)

17. "Insured Property" is defined by the Policy to include the property located at 5603 Courtney Avenue, Alexandria, Virginia 22304. (**Ex. 1** § VIII, Declaration Item 5, Endorsement No. 12.)

18. **Coverage F** includes coverage for the following:

1 . . . **Emergency Response Costs** resulting from a **Pollution Condition** on or migrating from the **Insured Property**. **Emergency Response Costs** must be first incurred by the **Insured** and reported to the Company during the **Policy Period**. For this Coverage to apply, all of the following conditions must be satisfied: (a) The **Insured** must report the **Emergency Response Costs** to the Company in accordance with Section III. of the Policy. (b) **COVERAGE – ON-SITE CLEAN UP OF NEW CONDITIONS** is purchased. . . .

(**Ex. 1** § I (emphasis in original).)

19.     "Emergency Response Costs" are defined by the Policy as:

reasonable and necessary expenses, including legal expenses incurred with the Company's written consent which consent shall not be unreasonably withheld or delayed, incurred in the remediation of soil, groundwater or other contamination that must be incurred: 1. In response to a **Pollution Condition** that necessitates immediate action; and 2. Within ninety-six (96) hours of the first commencement of such **Pollution Condition**; or as approved by the Company in writing.

(**Ex. 1** § VIII (emphasis in original).)

### B. The Pollution Condition at FCC Environmental's Alexandria, Virginia Facility

20.     On January 8, 2014, a truck driver for FCC Environmental driving Tank Truck 206 collected approximately 250 gallons of used oil from a Generator's used oil <u>collection tank</u> owned by General Machine Shop, Inc. ("**General Machine**"), located at 6000 Columbia Park Road in Hyattsville, Maryland.

21.     On January 8, 2014, following the collection of used oil from eight other Generators, the driver of Tanker Truck 206 delivered approximately 1600 gallons of used oil to FCC Environmental's used oil processing facility located at 5603 Courtney Avenue, Alexandria, Virginia (the "**Alexandria Facility**"). The 1600 gallons of used oil was off-loaded, transferred and mixed with the used oil in Tank 7.

22.     The contents of Tank 7 were subsequently transferred and mixed with used oil in three other tanks at the Alexandria Facility: Tanks 8, 10 and 11. A significant quantity of this

used oil, approximately 19,500 gallons, was thereafter transferred to three rail cars for shipment to FCC Environmental's fuel burning customers.

23.     In the afternoon of January 16, 2014, FCC Environmental was notified by one of its fuel customers that the used oil was potentially contaminated with PCBs.

24.     On January 17, 2014, Tanks 7, 8, 10 and 11 at FCC Environmental's Alexandria Facility were locked down to prevent any transfers of potentially contaminated used oil from those tanks. Tank Truck 206 was also locked down.

25.     PCBs are highly toxic compounds prohibited from being manufactured in the United States and further designated as a hazardous substance by regulations promulgated by the U.S. Environmental Protection Agency pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 40 CFR § 302.4.

26.     On January 17, 2014, FCC Environmental directed Phase Separation Science, Inc., an environmental consultant and certified analytical laboratory headquartered in Baltimore, Maryland, to sample and analyze the used oil tanks or containers for each of the used oil generator customers from which Tank Truck 206 collected used oil on January 8, 2014.

27.     The analytical results for eight of the nine used oil generator customers from which Tank Truck 206 collected used oil on January 8, 2014, established the absence of PCBs. The analytical results for General Machine's used oil tank established that its used oil contained PCBs at a concentration of 37,000 parts per million ("ppm").

28.     FCC Environmental subsequently determined that the PCBs that were present in the used oil collected from General Machine on January 8, 2014, when transferred and mixed with the used oil in Tank Truck 206 and subsequently transferred and mixed with the other used

oil in Tank 7, resulted in PCB's being discharged, released and/or dispersed to Tanks 7, 8, 10 and 11, thereby contaminating approximately 150,500 gallons of used oil product.

29.      Decontamination of FCC Environmental's fuel customers' three tanks has been accomplished by Guardian Environmental Services. All decontamination activities and procedures were carried out in compliance with the applicable requirements of the National Contingency Plan ("**NCP**"), set forth in 40 CFR Part 300. As of August 15, 2014, the four rail cars, six tanks, other equipment, associated piping and Transfer Trucks T-207 and TO-1002 at the FCC Environmental Alexandria Facility have been decontaminated in compliance with regulatory requirements and final confirmation wipe samples have been collected and forwarded to the laboratory for analysis.

30.      All of the PCB-contaminated used oil arising from General Machine's improper, illegal and illicit generation of PCBs (unknowingly collected by FCC Environmental) have been incinerated at a TSCA-licensed incinerator as required by 40 CFR Part 761. All incineration, as well as all testing, handling, decontamination and transportation activities related to incineration, have been carried out in compliance with the applicable requirements of the NCP.  Such activities are reasonable and necessary costs of response pursuant to the NCP.

31.      General Machine signed an FCC Environmental Service Order (No. 3173154) dated January 8, 2014, and certified that "the material collected from [General Machine's] facility by FCC Environmental, LLC does not contain any PCBs as defined by 40 CFR 761." (*See* Service Order No. 317154, attached as **Exhibit 2**.) Had General Machine not provided this PCB certification, FCC Environmental would not have accepted and thereafter transferred the used oil to its tanker truck.  FCC Environmental relied on General Machine's certification in

accepting this used oil. Upon the transfer of the used oil to the FCC Environmental's tanker truck, General Machine abandoned all rights to the oil.

32.     When it disposed of the 250 gallons of used oil General Machine knew or should have known it violated 40 C.F.R. § 262.11, which requires a generator of waste materials to accurately characterize such materials.

33.     When it disposed of the 250 gallons of used oil General Machine knew or should have known it violated 40 C.F.R. § 761.205(a)(2) and section 15 of TSCA, 15 U.S.C. § 2614, which requires a generator of PCB waste to notify the EPA of its PCB waste handling activities.

34.     When it disposed of the 250 gallons of used oil General Machine knew or should have known it violated 40 C.F.R. § 761.207(a) and section 15 of TSCA, 15 U.S.C. § 2614, which require a generator of PCB waste who relinquishes control over PCB waste by transporting or offering the PCB waste for transport to prepare a PCB waste manifest.

35.     As of October 3, 2014, FCC Environmental's costs of cleaning up and responding to the PCB contaminated used oil generated by General Machine at the Alexandria Facility are approximately one million one hundred thousand dollars ($1,100,000.00).

### C. FCC Environmental's Notice to ASIC of the Clean-Up Costs and Emergency Response Costs Incurred at the Alexandria, Virginia Facility

36.     On or about January 17, 2014, ASIC was notified in writing of the PCB contamination that occurred on January 8, 2014 at the Alexandria Facility ("**Pollution Claim**"). By letter dated January 24, 2014, directed to Scott Crandall ("**Crandall**"), FCC Environmental's Vice President, Eastern Region and Director Environmental Health, ASIC's representative Lynette Certain ("**Certain**") acknowledged receipt of the Pollution Claim.  Thereafter, ASIC was provided with all information it needed to respond to the Pollution Claim for coverage of FCC

Environmental's costs associated with cleaning up and responding to the PCB contamination, including but not limited to, under Coverage B and Coverage F of the Policy.

37.     On or about April 2, 2014, Certain sent Crandall a letter responding to the Pollution Claim, but only addressing Coverage H of the Policy. (*See* Letter from Certain to Crandall (Apr. 2, 2014), attached as **Exhibit 3**.)

38.     In response to this April 2, 2014 letter, Claire Juliana ("**Juliana**"), the Director – Environmental Claims Advocacy and an attorney with Aon Risk Solutions, the broker that placed the Policy, sent Certain an email dated April 15, 2014 requesting that ASIC revisit its coverage position with respect to the provisions under Coverage B and Coverage F, and further providing reasons why the Pollution Claim should be accepted as a covered event. (*See* Email from Juliana to Certain (Apr. 15, 2014) attached as **Exhibit 4**).

39.     Thereafter, on or about May 9, 2014, Certain sent a letter to Crandall denying FCC Environmental's request for coverage of the PCB contamination at the Alexandria Facility under Coverage B and Coverage F. (*See* Letter from Lynette Certain to Scott Crandall (May 9, 2014), attached as **Exhibit 5**.)

40.     In her May 9, 2014 letter, Certain improperly maintained that the PCB contamination at the Alexandria Facility did not meet the definition of "Pollution Condition" under the Policy, contending that "there was no discharge, dispersal, release or escape of the oil" because "the oil did not escape its confinement," but "was transferred from one containment vessel into another containment vessel." (*Id.*) Certain further asserted that because FCC picked up the used oil contaminated with PCBs from General Machine, it was "a transaction in the ordinary course of business" which "does not constitute illicit abandonment." (*Id.*) The Policy

contains no reference to the limitations relied upon by Certain nor defines the terms "discharge," "dispersal," "release," "escape" or "illicit abandonment."

41.     On May 29, 2014, counsel for FCC Environmental, Christopher Harris ("**Harris**") responded to Certain's May 9, 2014 letter and requested that ASIC rescind its denial of coverage. (*See* Letter from Harris to Certain (May 29, 2014), attached as **Exhibit 6**.)

42.     In that letter, Harris noted the following:  (1) the "PCBs generated by General Machine have been dispersed," as they were "widely distributed" from FCC Environmental's tanks, to railcars, tank trucks, and other equipment including valves gauges and hoses; (2) "[t]he original quantity of the PCB-contaminated used oil, as generated by General Machine, was 250 gallons. This was dispersed and the PCBs now contaminate 150,500 gallons of used oil" and (3) "there have been numerous transfers of the PCB-contaminated oil involving tank trucks, tanks, and railcars, and that during each transfer – including into and out of FCC's customers' tanks – there inevitably were small releases of the PCB contaminated used oil." (*Id.*)

43.     Harris additionally pointed out that "General Machine engaged in an illicit abandonment of the PCB-contaminated used oil" because "General Machine's transfer of the PBCs contained in the used oil was illicit (unlawful and prohibited) because such a transfer violated several applicable legal requirements" including but not limited to: 40 C.F.R. § 262.11; 40 C.F.R. § 761.205(a)(2) and section 15 of TSCA, 15 U.S.C. § 2614; and 40 C.F.R. § 761.207(a) and section 15 of TSCA, 15 U.S.C. § 2614. (*Id.* at 4-5.) Furthermore, he stated that "General Machine violated its contractual obligation not to transfer contaminated used oil to FCC Environmental. General Machine falsely certified that the material collected by FCC Environmental at General Machine's facility did not contain any PCBs. (*Id.* at 5). Finally, he

11

informed Certain that General Machine abandoned its used oil when it "disposed of, discarded and relinquished possession of its PBC-contaminated used oil." (*Id.*)

44.     On July 9, 2014, Certain responded to Harris' May 9, 2014 letter and again denied FCC's Environmental's claim, stating: "AIG's determination remains that there is no coverage under Coverage B or Coverage F as there was no Clean-Up Costs or Emergency Response Costs resulting from a Pollution Condition." (See Letter from Certain to Harris (July 9, 2014), attached as **Exhibit 7**.) Once again, AIG's denial of coverage centered on its determination that the PCB contamination at FCC's Alexandria Facility did not constitute a Pollution Condition, as defined by the Policy. (**Ex. 7** at 1-3.)

45.     On or about October 2, 2014, FCC Environmental provided formal notice to ASIC pursuant to Section 2 of the Policy, that "the costs, losses and expenses incurred by FCC Environmental, LLC resulting from the Pollution Condition as set forth in the above-referenced claim [the Pollution Claim] exceed $500,000.00." (*See* Letter from Crandall to Manager, Pollution Insurance Products Department, Chartis Claims, Inc. (Oct. 2, 2014), attached as **Exhibit 8**).

### D. The General Machine Action

46.     On or about June 12, 2014 FCC Environmental filed suit against General Machine in this Court, *FCC Environmental, LLC v. General Machine Shop, Inc.*, Case No. 1:14-cv-723 LMB/TCB (E.D. Va 2014) (the "**General Machine Action**") asserting the following claims against General Machine: liability under CERCLA 42 U.S.C. § 9607(a); breach of contract; breach of implied warranty; negligence and fraudulent inducement. ASIC has denied FCC's Environmental's request for coverage of its legal fees incurred in prosecuting the General Machine Action.

## COUNT I—BREACH OF CONTRACT

47.     The allegations in paragraphs 1 through 46 are incorporated by reference as if fully set forth herein.

48.     The Policy is a valid and enforceable contract between FCC Environmental and ASIC that is governed under the laws of the State of Texas. FCC Environmental fully performed its obligations under the contract.

49.     With respect to the Alexandria Facility, FCC Environmental obtained twenty-five million dollars ($25,000,000.00) in coverage for each incident arising under Coverage B, and two-hundred fifty thousand ($250,000.00) in coverage for each incident arising under Coverage F. Additionally with respect to the Alexandria Facility, FCC Environmental obtained forty-million dollars ($40,000,000.00) in aggregate coverage for Coverage B and one million dollars ($1,000,000.00) in aggregate coverage for Coverage F.

50.     When General Machine disposed of and transferred the 250 gallons of used oil to FCC Environmental, it abandoned all rights to that used oil.

51. General Machine's illegal disposal of 250 gallons of used oil containing 37,000 parts per million of PCBs contaminated FCC Environmental's used oil product, rail cars, tanks, tank trucks, associated piping and other equipment, occurred without FCC Environmental's consent, constituted an illicit abandonment of a hazardous substance at the Alexandria Facility, and constitutes a Pollution Condition under the Policy.

52.     The PBCs contaminating the 250 gallons of used oil from the General Machine facility were broken up and scattered about, caused to separate in different directions, sent in different directions, and were widely distributed, all of which constitutes a dispersal when they were transferred from General Machine's facility into FCC Environmental's Tank Truck 206,

13

and subsequently transferred, mixed and dispersed with used oil product in FCC Environmental's tanks, rail cars, associated piping and other equipment. This dispersal and release of PCBs at the Alexandria Facility are each a Pollution Condition as defined by the Policy.

53.     During the numerous transfers of the PCB-contaminated oil involving tank trucks, tanks, railcars, associated piping and other equipment, there were small drips, leaks and spills of the PCB-contaminated used oil. This release of PCBs at the Alexandria Facility is a Pollution Condition under the Policy.

54.     As a result of the release, dispersal and illicit abandonment of PCBs at the Alexandria Facility, FCC Environmental was forced to incur over one million one hundred thousand dollars ($1,100,000.00) in response costs associated with the management, testing, storage and disposal of the PCB contaminated used oil, in compliance with the NCP and TSCA, which constitute Clean-Up Costs and Emergency Response Costs under the Policy, and additional costs are still being incurred.

55.     By denying coverage of FCC Environmental's Clean-Up Costs, as defined by the Policy, which resulted from General Machine's dispersal, release and illicit abandonment of PCBs at the Alexandria Facility, ASIC is in breach of Coverage B of the Policy.

56.     By denying coverage of FCC Environmental's Emergency Response Costs, as defined by the Policy, resulting from General Machine's dispersal, release and illicit abandonment of PBCs at the Alexandria Facility, ASIC is in breach of Coverage F of the Policy.

57.     As a result of ASIC's breach of the Policy, FCC Environmental has incurred more than one million one hundred thousand dollars ($1,100,000.00) in expenses resulting in six

hundred thousand dollars ($600,000.00) in net damages taking into account a self-insured retention of five hundred thousand dollars ($500,000.00).

WHEREFORE, FCC Environmental prays for judgment against ASIC as follows:

(1)     an amount to be proven at trial but not less than six hundred thousand ($600,000.00);

(2)     its attorneys' fees and costs incurred in prosecuting the General Machine action;

(3)     its attorneys' fees and costs incurred in prosecuting this action;

(4)     pre-judgment and post-judgment interest; and

(5)     such other relief as this Court deems just and proper.

## COUNT II—BAD FAITH LIBILITY UNDER TEX. INS CODE § 541.060

58. The allegations in paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

59. When the PCB-contaminated oil was dispersed, released and illicitly abandoned at the Alexandria facility, one or more Pollution Conditions occurred, and ASIC was obligated to cover FCC Environmental's Clean Up Costs and Emergency Response Costs under Coverage B and Coverage F of the Policy. ASIC does not have a reasonable basis for denying FCC Environmental's claim for coverage under the Policy.

60.     ASIC knew that it did not have a reasonable basis for denying FCC Environmental's claim, and that its liability had become reasonably clear.  ASIC asserted that because FCC picked up the used oil contaminated with PCBs from General Machine, it was "a transaction in the ordinary course of business" which "does not constitute illicit abandonment." However, there is no provision in the Policy that establishes any such exclusion to the coverage for illicit abandonment.

61.     As demonstrated by the Certain and Harris letters referenced in Paragraphs 39-44, ASIC engaged in unfair settlement practices by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of FCC Environmental's claim and, in fact, had acted in bad faith.

62.     Based on the foregoing bad faith conduct, FCC Environmental has been damaged in excess of six hundred thousand ($600,000.00) in direct and consequential damages, as well as its attorneys' fees and costs in prosecuting the General Machine Action as a result of ASIC's unfair practice in the business of insurance.

63.     ASIC's unreasonable denial of FCC Environmental's claim was made knowingly, deliberately and intentionally, with actual awareness of the unfairness of the act or practice, entitling FCC Environmental to recovery of treble damages in the amount of at least one million eight hundred thousand dollars ($1,800,000.00), pursuant to Tex. Ins. Code § 541.152(b).

64.     ASIC's denial of FCC Environmental's claim was made willfully, intentionally and knowingly with such malice and a conscious disregard of the rights of FCC Environmental to entitle FCC Environmental to recover punitive damages in the amount of ten million dollars ($10,000,000.00).

WHEREFORE, FCC Environmental prays for judgment against ASIC as follows:

(1)     an amount to be proven at trial but not less than six hundred thousand dollars ($600,000.00) for its actual damages;

(2)     treble damages in the amount of at least one million eight hundred thousand dollars ($1,800,000.00);

16

(3)     punitive damages in the amount of ten million dollars ($10,000,000.00);

(4)     FCC Environmental's court costs and reasonable and necessary attorney's fees in prosecuting the General Machine Action;

(5)     FCC Environmental's court costs and reasonable and necessary attorney's fees in prosecuting this action;

(6)     Pre-judgment and post-judgment interest; and

(7)     such other relief as this Court deems just and proper.

**FCC ENVIRONMENTAL, LLC.**
**By Counsel**

Alan B. Croft (VSB #9209)
Laura Golden Liff (VSB #80618)
**McCANDLISH & LILLARD, P.C.**
201 Loudoun Street, SE, Suite 201
Leesburg, Virginia 20175
PH: (703) 934-1105
FX: (703) 737-0165
acroft@mccandlaw.com
lliff@mccandlaw.com

*Counsel for Plaintiff*